# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

JMCB, LLC, ON BEHALF OF ITSELF
AND ALL OTHERS SIMILARLY
SITUATED

                                        CIVIL ACTION

VERSUS

                                        NO. 17-77-JWD-JCW

THE BOARD OF COMMERCE &
INDUSTRY; LOUISIANA
DEPARTMENT OF ECONOMIC
DEVELOPMENT; AND SABINE PASS
LIQUEFACTION, LLC

## RULING AND ORDER

This matter comes before the Court on *Sabine Pass Liquefaction, LLC's* ("SPL") *Motion*

*to Dismiss* (Doc. 67).  Plaintiff JMCB, LLC opposes the motion (Doc. 72), and SPL has filed a

reply (Doc. 76).  Oral argument is not necessary.  For the following reasons, SPL's motion is

granted.

## I.     Introduction

Defendants in this matter are (1) The Board of Commerce and Industry (the "Board"); (2)

the Louisiana Department of Economic Development ("LDED") (the "Board" and "LDED" are

collectively, the "State Defendants"); and (3) SPL. (Doc. 61 ¶ 1.)  While this motion is made

only by SPL and not the State Defendants (who have filed a separate *Motion to Dismiss Certain*

*Claims Pursuant to Federal Rule of Civil Procedure 12(b)(6)* (Doc. 66)), SPL seeks dismissal of

all claims in this action (Doc. 67 at 1; Doc. 67-1 at 19.)

This case is about the alleged invalidity of a contract between the State Defendants and

SPL granting an exemption to ad valorem taxes (also known as "property taxes") (the

"Contract"). The Contract was entered into pursuant to Article VII, Section 21 of the Louisiana Constitution of 1974, which provides in relevant part:

> Section 21. In addition to the homestead exemption provided for in Section 20 of this Article, the following property and no other shall be exempt from ad valorem taxation:
> . . .
> (F) Notwithstanding any contrary provision of this Section, the State Board of Commerce and Industry or its successor, with the approval of the governor, may enter into contracts for the exemption from ad valorem taxes of *a new manufacturing establishment or an addition to an existing manufacturing establishment*, on such terms and conditions as the board, with the approval of the governor, deems in the best interest of the state.
>
> The exemption shall be for an initial term of no more than five calendar years, and may be renewed for an additional five years. All property exempted shall be listed on the assessment rolls and submitted to the Louisiana Tax Commission or its successor, but no taxes shall be collected thereon during the period of exemption.
>
> *The terms "manufacturing establishment" and "addition" as used herein mean a new plant or establishment or an addition or additions to any existing plant or establishment which engages in the business of working raw materials into wares suitable for use or which gives new shapes, qualities or combinations to matter which already has gone through some artificial process.*

La. Const. art. VII, § 21(F) (emphasis added).

Plaintiff is a company that "owns property (land) in Cameron Parish which is subject to ad valorem taxes for which no exemption is available" (Doc. 61 ¶ 25) and purports to bring this action on behalf of itself and individuals who "own property in Cameron Parish . . that is subject to ad valorem taxation, and any and all Cameron Parish governmental bodies that are entitled to receive Cameron Parish ad valorem taxes, as of October 12, 2016." (*Id.* ¶ 36.) Plaintiff maintains that "it will have an inflated ad valorem tax liability due and payable to Cameron Parish taxing bodies that receive ad valorem taxes as a result of the exemption granted to SPL through the Contract." (*Id.* ¶ 26.) Further, Plaintiff contends "that it and the class members would, including

the Cameron Parish taxing bodies that receive ad valorem taxes, benefit from the payment of ad valorem taxes by SPL." (*Id.* ¶ 26.)

Plaintiff's claims boil down to the following: the Board's action was improper, and SPL's contract for the exemption of ad valorem taxes is thus null, for two reasons. First, SPL stated in its Application that it was building an "addition to an existing manufacturing establishment . . . when, in fact, SPL did not have an existing manufacturing plant or establishment of any kind at the project location at the time the Board considered its application." (Doc. 61 ¶ 27). Second, according to Plaintiff, SPL's facility did not satisfy the definition of "manufacturing establishment" or "addition" in that it was not "engaged in the business of working raw materials into wares suitable for use or which gives new shapes, qualities or combinations to matter which already has gone through some artificial process at that project location and at the time the Board considered its Application." (*Id.*)

The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and finds that Plaintiff has failed to state a cognizable claim. Preliminarily, Plaintiff has not responded to any of the substantive arguments raised by SPL, so SPL's motion is largely unopposed. But, even putting this aside,[1] Plaintiff's claims must fail. The documents submitted by SPL in connection with its motion (which are referenced in and central to Plaintiff's Amended Complaint and can thus be considered) demonstrate that SPL's facility satisfied the definition of "manufacturing establishment" under Louisiana law. Even if it

---

[1] Plaintiff did file an Ex Parte *Motion for Leave to File Sur-Reply Memorandum in Opposition to [SPL's] Motion to Dismiss* (Doc. 77) stating in part: "Although Plaintiff did outline sufficient facts in that briefing in support of its argument that it has stated claims upon which relief may be granted, upon reviewing SPL's reply memorandum (Doc 76), Plaintiff shows that some additional briefing which further outlines and details the facts alleged by the Plaintiff in support of its claims in the Amended Complaint may assist the Court in its consideration of the motion." (Doc. 77 at 1–2.) The Court denied Plaintiff's request as follows: "The briefing order states that 'Sur-reply briefs will be permitted only with leave of Court for extraordinary reasons supported by sufficient facts.' Plaintiff has failed to demonstrate extraordinary reasons justifying the filing of a sur-reply brief." (Doc. 78.) The Court agrees with that decision but notes that, having reviewed the additional brief, the result would still be the same.

did not, Plaintiff has not shown that the State Defendants' decision was arbitrary or capricious. And, lastly, Plaintiff fails to provide any authority (law or regulation) that would invalidate the Contract because SPL's manufacturing establishment was new rather than an addition; rather, the Article VII, Section 21(F) authorizes the tax exemption under either situation without regard to what is in the application. For all these reasons, Plaintiff has failed to state a claim.

The Court also rejects Plaintiff's sole procedural argument made in opposition to the motion. Plaintiff's entire opposition is centered on the somewhat convoluted argument that, even though Plaintiff is seeking to invalidate the Contract between SPL and State Defendants, because the State Defendants have acknowledged that Plaintiff stated a claim, and because the Court found that SPL is a necessary and indispensable party, then SPL cannot seek dismissal of the entire Amended Complaint but must rather wait for the adjudication of the claims against the State Defendants. Putting aside the fact that this contention appears to conflict with basic fairness and common sense, the entire argument fails because the State Defendants have clearly and unambiguously said that they deny that Plaintiff has stated a claim and that, if SPL's motion is successful, they should be dismissed as well. Thus, Plaintiff is left with no basis for opposing SPL's motion.

Nevertheless, the general rule in the Fifth Circuit (and common judicial practice) is to allow plaintiffs at least one opportunity to amend their complaint following a ruling granting a motion to dismiss. The Court will act according to this general rule and grant Plaintiff leave to amend its complaint to cure the deficiencies.

## II.    Relevant Background

The following allegations are taken from the *First Amending Class Action Complaint* (Doc. 61) ("Amended Complaint").  They are assumed to be true for purposes of this motion. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014).

### A.  The Application Process Generally (According to the Complaint)

Plaintiff alleges that, "[i]n order to apply for the exemption, an advance notification form must be filed with LDED prior to the beginning of construction or installation of facilities." (Doc. 61 ¶ 6.)  "An application must also be filed with LDED during the prescribed time period allowed by the rules. According to the rules [in Title 13, Chapter 5 of the Louisiana Administrative Code], eligibility of the applicant and the property for the exemption is reviewed by the Board based upon the facts and circumstances existing at the time the application is considered." (*Id.*).  According to Plaintiff, "[a]n application filed prior to completion of construction may be considered by the Board and a contract may be executed based upon the best available estimates of the values of the buildings, equipment and machinery to be made part of the facility, subject to review and approval of the Project Completion Report and Affidavit of Final Cost." (*Id.*)  Further, Plaintiff asserts that, "[a]ssuming the Board votes to approve the exemption request, the exemption itself is evidenced by a written contract that is signed by the governor of Louisiana, the Board, and the applicant/manufacturer." (*Id.* ¶ 7.)

### B.  SPL's Application Process

#### 1. Initial Submissions

On or about April 15, 2011, Didier Consultants, Inc. ("Didier")—SPL's consultant—submitted, on SPL's behalf, "an Industrial Ad Valorem Tax Exemption Program Application ('Application') and an Advance Notification form to LDED for the purpose of applying for an ad valorem tax exemption provided for at La. Const. art. VII, § 21(F)." (Doc. 61 ¶ 8.)  Plaintiff

alleges that these documents (1) stated that the "project's physical address and actual location was 9243 Gulf Beach Highway, Cameron, Louisiana"; (2) said in the "Product Manufactured" ection of the Application: "Liquefied Natural Gas"; (3) provided the following in the "Manufacturing Process" section as a description: " 'The manufacturing process begins with natural gas, which is "worked" into a new quality and combination to matter, defined as liquefied natural gas, by means of an artificial process' "; and (4) "suggested that SPL's investment amount in the project, to be considered for the exemption, would be $6,000,000,000." (*Id.* ¶ 8.)

Plaintiff also alleges:

> The Application indicated that the project type was an "addition to an existing plant," and the Advance Notification form indicated that the project type was an "expansion," thus implying that SPL had an existing plant or establishment at the project location and that SPL was applying for an exemption under the "addition to an existing manufacturing establishment" portion of the constitutional provision.

(*Id.* ¶ 9.)  The Amended Complaint then asserts:

> Upon information and belief, Plaintiff avers that SPL did <u>not</u> have an existing manufacturing plant or establishment of any kind at the project location (9243 Gulf Beach Hwy., Cameron, Louisiana) at the time that SPL's Application was considered by the Board, and was not engaged in the business of working raw materials into wares suitable for use or which gives new shapes, qualities or combinations to matter which already has gone through some artificial process. In fact, upon information and belief, construction on SPL's facility did not begin until August 2012 - well after the Application was considered by the Board.

(*Id.* ¶ 10 (emphasis in original).)

### 2. State Defendants' Response to the Application

Around April 18, 2011, LDED sent a letter to SPL, through Didier, saying that it had received the documentation concerning SPL's project. (Doc. 61 ¶ 11.)  The LDED then "assigned Application Number 20110659-ITE to SPL's proposed project." (*Id.*)

A few days later, on April 21, 2011, LDED sent an email to Didier expressing, among other things, that the consensus after internal discussions about the project was that:

> "the manufacturing process as stated does not meet the qualification of manufacturing. If all the company is doing is taking natural gas and freezing it, that has not been considered manufacturing by the department or the board. However, if they are doing additional processing of the natural gas prior to the freezing, then it could be considered manufacturing. Please get a better description of the manufacturing process so that we can make a determination."

(Doc. 61 ¶ 12; *see also* Doc. 67-2 at 2.)

### 3. SPL's Reply to State Defendants' Response

Plaintiff then makes two allegations on information and belief about SPL's reply. First, while SPL provided further information about its purported manufacturing process to LDED, the information provided by SPL "confirmed that SPL's process does not meet the qualification of manufacturing under the constitutional provision" because "SPL's process simply takes natural gas and freezes it until it turns into liquid form." (Doc. 61 ¶ 13.) Second, Plaintiff claims that "the description of its proposed process in the Application and the additional information provided comprises all of the descriptions and information SPL provided to LDED about its process, and the Board did not conduct any independent investigation into whether SPL's process qualified as manufacturing under the constitutional provision." (*Id.* ¶ 14.)

However, Defendant submits as an exhibit to its opposition the "information [Didier] supplied in response on behalf of [SPL] to the [LDED] on or about April 27, 2011." (Doc 67-2 ¶ 4.) The first page of this response is an email from someone with Didier to certain individuals (presumably with LDED) stating, "Thank you so much for spending the time with Daniel and I yesterday. We appreciate your help. Below is Daniel's contact information." (*Id.* at 3.)

The next two pages appear to be copies of a webpage from SPL's parent company Cheniere Energy Partners, L.P. ("Cheniere Partners"), describing the "Sabine Pass" project with

SPL. (*Id.* at 4–5.)  This page explains how Cheniere Partners "initiated a project to include liquefaction services at the [SPL] receiving terminal in Cameron Parish" and that "[a]dding liquefaction capabilities would transform the [SPL] terminal into a bi-directional facility capable of liquefying and exporting natural gas in addition to importing and regasifying foreign-sourced LNG." (*Id.* at 4.)

The final exhibit, also from a webpage, is titled the "ConocoPhillips Optimized Cascade Process." (*Id.* at 6.)  After listing the "several advantages" of this project, the page contains this graphic of the process:



(*Id.*)  The page then provides a description of the process which includes the following:

> Natural gas is first treated to remove contaminants including CO2, water and mercury before entering the liquefaction section of the plant. The treated gas is then chilled to approximately —260 degrees Fahrenheit in successively colder heat exchangers that use propane, ethylene and methane as refrigerants. Product leaving the methane exchangers is LNG ready for storage.

(*Id.*)

### 4. State Defendants' Approval of the Application, the Contract, and the Tax Benefit at Issue

Continuing with the allegations of the Amended Complaint, around June 8, 2011, LDED notified SPL by letter to Didier that the Application would be considered by the Board at its June 28, 2011 meeting. (Doc. 61 ¶ 15.)  The operative complaint alleges:

> Despite the fact that LDED's staff correctly questioned whether SPL's stated process met the qualifications of manufacturing, and despite receiving further information from SPL that confirmed that its process did not meet the qualifications of manufacturing, LDED enclosed with the letter a work sheet containing LDED's staff's unreasonable recommendation of "approval" relative to the Application. Specifically, the work sheet is dated May 24, 2011, and noted that: the company name is "Sabine Pass Liquefaction, LLC"; the project type is "expansion"; the contract amount was "$6,000,000,000"; the ad valorem tax was "$1,447,200,000"; and, the staff recommends "approval." The comments section of the work sheet also referred to the contract as a "front end contract."

(*Id.*)

Around July 19, 2011, LDED sent a letter to SPL (via Didier) expressing that the Board "voted to approve SPL's request for tax exemption on the estimated $6,000,000,000 investment amount at its July 18, 2011 meeting." (*Id.* ¶ 16.)  The Contract was initially for a period of five years with a provision for an additional five years of exemption if there was compliance with the Contract and the rules governing the tax exemption program.  (*Id.*)  The Contract was a "Front End" contract, so it had the additional requirement of filing an "Annual Status Declaration for Advance Contracts form."  (*Id.*)

Plaintiff complains about particular provisions of the Contract as follows:

> Plaintiff shows that one section of the Contract states that "…the Contractee (referring to SPL) *will construct a manufacturing establishment* in the State of Louisiana…", but in the same sentence, the Contract then states that "… the creation and operation of the said *addition* has been deemed by the Board to be of

great benefit to the State…" (emphasis added). Later in the Contract, it states that "[T]he Contractee *will construct* at an approximate cost of $6,000,000,000, *an addition to its manufacturing establishment*." (emphasis added).

(*Id.* ¶ 17 (emphasis in original).)  The Contract was executed by SPL's CFO, the Board, and the Governor on August 1, October 4, and October 12, 2011, respectively.  (*Id.* ¶ 18.)

Under Article V of the Contract, the agreement's effective date "shall be the last day of the tax assessment year in which the project becomes operational as stated in the Project Completion Report[.]" (Doc. 61 ¶ 20.)  Additionally, "from the effective date of the Contract and for a period of five (5) years thereafter, the Board gives and grants unto SPL an exemption from all ad valorem taxes, including all state, parish, municipal, district and special taxes for the property belonging to SPL as described in the Affidavit of Final Cost." (*Id.*) Under Article IV of the Contract, SPL had to file with LDED's Office of Business Development a sworn statement indicating the exact date of completion and beginning of operation on the Project Completion Report within thirty days "following the last day of the month after effective operation has begun, or construction is essentially complete, whichever occurs last." (*Id.* ¶ 21.)

Plaintiff alleges:

Upon information and belief, the Contract was considered to be a "Front End" contract due to the fact that the effective date of the contract and the resulting tax exemption would occur several years after the contract was actually executed, and SPL was required to file an Annual Status Declaration for Advance Contracts form each year with LDED until the effective date.

(*Id.* ¶ 22.)

Plaintiff claims that construction at the facility began in August 2012 and that, according to news reports, portions of the SPL facility became operational in February 2016. (*Id.* ¶ 23.) "[T]he first cargo vessels loaded with liquefied natural gas sailed from the facility on February

24, 2016." (*Id.*)  Plaintiff asserts that, based on these reports and Article V of the Contract, the effective date of the agreement was December 31, 2016. (*Id.*)

Plaintiff further alleges that LDED created "sub-numbers" concerning "Number 20110659-ITE[.]" (Doc. 61 ¶ 24.)  One sub-number was made upon SPL's submission of a Project Completion Report and Affidavit of Final Cost to LDED.  This sub-number "shows an approved investment amount of $4,797,201,241.00, and an estimated tax benefit amount of $1,167,159,062." (*Id.*)  A second sub-number "was created for the remaining portion of the project described in Number 20110659-ITE, and has been assigned an estimated investment amount of $2,486,889,823.00, and an estimated tax benefit amount of $516,278,327." (*Id.*) Plaintiff asserts: "[U]pon information and belief, the original Contract executed in 2011 is the only contract that applies to the SPL project described under Number 20110659-ITE." (*Id.*)

## C.  Plaintiff's Objections to the Contract

Again, Plaintiff's claims boil down to the following: (1) SPL submitted the Industrial Ad Valorem Tax Exemption Program Application and Advance Notification form to LDED stating that it was applying for an "addition to an existing manufacturing establishment" when, in reality, there was no existing manufacturing establishment at the project location; and (2) SPL "was not engaged in the business of working raw materials into wares suitable for use or which gives new shapes, qualities or combinations to matter which already has gone through some artificial process at that project location and at the time the Board considered its Application" (*Id.* ¶ 27.)  Plaintiff thus alleges that the Board "exceeded its constitutional authority in entering into the Contract because SPL did not qualify and was not authorized to receive an industrial tax exemption under the 'addition to an existing manufacturing establishment' provision of La.

Const. art. VII, § 21(F)." (*Id.*.)  Plaintiff seeks a declaration that the Board's action was improper and that the Contract was null.  (*Id.* ¶¶ 29–34.)

Significantly, with respect to Plaintiff's second line of attack, Plaintiff alleges that "the process described by SPL in its Application *and/or as described in additional information provided to LDED* does not meet the required definition of 'working raw materials . . .'" (Doc 61 ¶ 35 (emphasis added).)

### D.  Procedural History

On October 12, 2016, Plaintiff filed its original *Class Action Petition* in the 19th Judicial District Court. (Doc. 1-2 at 1.)   On February 10, 2017, SPL removed the action to this Court. (Doc. 1.)

On March 24, 2017, SPL moved to dismiss the Class Action Petition. (Doc. 15.)  Plaintiff responded by filing a motion to voluntarily dismiss SPL (Doc. 16), which this Court granted on April 5, 2017. (Doc. 17)

SPL subsequently filed a motion to reconsider and vacate the Court's order and, alternatively, to intervene (Doc. 22.)  On December 5, 2017, the Court granted SPL's motion, finding that SPL should be joined as a necessary and indispensable party under Fed. R. Civ. P. 19 or through intervention under Rule 24. (Doc. 57 at 2.)  Plaintiff was given an additional twenty-eight days to clarify its allegations against all parties. (*Id.*)

On January 12, 2018, Plaintiff filed its *First Amended Class Action Complaint*. (Doc. 61.) On February 16, 2018, SPL filed the instant motion seeking dismissal of all claims. (Doc. 67-1.)

### III.    Rule 12(b)(6) Standard

In *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346 (2014), the Supreme Court explained "Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader

is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." 135 S. Ct. at 346–47 (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand, supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-00177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

The Fifth Circuit further explained that all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014). The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted." *Id.* at 503.

## IV. Discussion

### A. Parties' Arguments

#### 1. SPL's Original Memorandum (Doc. 67-1)

SPL first argues that Plaintiff fails to adequately challenge the "manufacturing establishment" status of SPL's facility. SPL asserts that Plaintiff's allegations are conclusory and that, while Plaintiff alleges that the information provided by SPL was inadequate, Plaintiff fails to describe what that information was. SPL further contends that this was an intentional omission by Plaintiff, as the documents SPL submits demonstrate that SPL's facility was a "manufacturing establishment." (Doc. 67-1 at 12.) Plaintiff thus pleads no facts supporting its conclusion that the SPL facility was not a "manufacturing establishment."

SPL next asserts that, in any event, the constitutional provision at issue does not require a particular description in an application; "all that matters is that the subject property contain a 'new manufacturing establishment or an addition to an existing manufacturing establishment.' " (*Id.* at 13.) SPL then notes that the operative complaint "does not even purport to challenge any of the State's administrative rules or the States' application of those rules here." (*Id.*)

SPL then contends that its facility satisfies the definition of "manufacturing establishment" based on the relevant case law. SPL also points to a 1938 Louisiana Attorney General Opinion which allegedly "interpreted natural gas operations as 'manufacturing establishments.' " (*Id.* at 15 (citing Op. Atty. Gen. 1938-1940, p. 1180 (Dec. 16, 1938)).) This

particular opinion from the Louisiana Attorney General specifically found that a facility treating natural gas to remove "undesirable elements" qualified as a "manufacturing establishment." (*Id.* (quoting Op. Atty. Gen. 1938-1940, at 1181–82).)  What SPL does—both as alleged in the operative complaint and as detailed in the exhibits to SPL's opposition—easily satisfies this standard.

SPL next argues that, even if there were a question about SPL's status as a "manufacturing establishment", the LDED and Board's decision are "entitled to deference under an 'arbitrary and capricious' standard because the constitution grants the State *sole authority* and discretion to determine eligibility for the exemption." (Doc. 67-1 at 17 (citations omitted).)  SPL maintains that the operative complaint "comes nowhere close to pleading a plausible claim of arbitrary and capricious conduct by anyone." (*Id.*)  To the contrary, Plaintiff's complaint shows that LDED's employees had "several discussions internally" concerning SPL's facility's status as a "manufacturing establishment" and then requested a "better description" from SPL to "better understand the manufacturing process so that we [(i.e., LDED)] can make a determination." (*Id.* at 17–18 (quoting Amended Complaint, ¶¶ 12–13).)

Finally, as to Plaintiff's contention that SPL's facility was a "new manufacturing establishment" rather than an "addition" to one, SPL asserts that Plaintiff has failed to state a claim because, "even if Plaintiff's allegation were true (and it is not), the distinction is without a legal difference." (*Id.* at 18.)  Article VII, Section 21(F) allows for exemptions for both "new manufacturing establishments" and "additions."  Further, "Section 21(F) *makes no reference to applications* whatsoever.  Nor do any of the rules that [the Board] has promulgated under that section impose any requirement that an applicant perfectly describe the facility in its application or materials provided to LDED." (*Id.* at 18 (emphasis in original).)  SPL states:

> In other words, an industrial tax exemption is not unconstitutional merely because an *application* submitted in connection with the exemption (or a resulting contract) does not describe the property in a certain way. . . . [A]s long as it qualifies as a 'manufacturing establishment' it must either be a 'new' facility or an 'addition to' an existing facility. Either way, the constitution would have authorized the State to grant the exemption regardless.

(*Id.* at 19 (emphasis in original).)

After adopting the three specific arguments the State Defendants assert in their motion to dismiss[2] and those asserted by Cameron LNG, LLC in the related suit *JMCB, LLC v. The Board of Commerce & Industry, et al.*, No. 17-75, SPL seeks dismissal of the entire complaint.

### 2. Plaintiff's Opposition (Doc. 72)

Plaintiff begins by explaining how it originally moved to dismiss SPL because the State Defendants were the "only parties alleged to have committed the unconstitutional acts outlined in the original Complaint as public servants or governmental entitles" and because the State Defendants only moved for dismissal of certain claims. (Doc. 72 at 2.) According to Plaintiff, State Defendants acknowledged that "Louisiana law grants a citizen the right to seek judicial review of acts of public servants that are alleged to have been illegal or unconstitutional, and to enjoin any unlawful action by those public servants." (*Id.* (quoting Doc. 14-1 at 2).) Thus, Plaintiff argues, it did state a cognizable claim against the State Defendants, and this was one that State Defendants recognized.

However, Plaintiff continues, the Court allowed SPL to rejoin the litigation, and SPL then moved for dismissal of the entire Amended Complaint. Yet the State Defendants again did not join SPL in its motion to dismiss but rather again recognized that Plaintiff had a claim. "As a

---

[2] As SPL states, these grounds are: "(1) Plaintiff is not entitled to recovery of attorney's fees, (2) the government plaintiffs do not have a cause of action because they are not taxpayers or citizens, and (3) Plaintiff cannot represent any governmental entities in a proposed class." (Doc. 67-1 at 19.) The Court will address these issues in ruling on the State Defendants' motion. (Doc. 66.)

result, the Plaintiff's claims for declaratory relief and the entire Amended Complaint cannot be dismissed as to the indispensable State Defendants at this time." (*Id.* at 4.)

Plaintiff then argues that SPL has taken an inconsistent position: "If the indispensable State Defendants acknowledge that the Plaintiff has stated a claim upon which relief may be granted and the case will proceed against them at this time, then how can SPL, as a Court-ordered *indispensable party co-defendant*, procedurally seek dismissal of the entire Amended Complaint as to it?" (*Id.* at 4–5 (emphasis in original).) Plaintiff further contends that it is inconsistent for SPL to argue that it is an indispensable party that must participate in the case but then to move to dismiss the entire Amended Complaint:

> Plaintiff avers that SPL must decide whether it wants to participate in the case and defend and protect its interests or not, because moving to dismiss all of the Plaintiff's claims and the entire Amended Complaint as to it certainly suggests that it does <u>not</u> want to participate in the case that will proceed against the State Defendants. Indeed, if the Court were to grant SPL's motion to dismiss all of the Plaintiff's claims and the entire Amended Complaint as to it, then SPL would be out of the case *again*.

> Plaintiff avers that if one or more indispensable co-defendants acknowledge that a plaintiff has stated a claim upon which relief may be granted against them, then any other *indispensable co-defendant parties* named in the suit have no choice but to accept that reality and must be estopped from moving to dismiss the entire complaint as to them because the plaintiff's claims which are not challenged in a motion to dismiss by the acknowledging indispensable party co-defendant must necessarily proceed against *all* of the indispensable party defendants. Here, dismissing the entire Amended Complaint as moved for by SPL is not a viable procedural option for SPL because the State Defendants acknowledge that the Plaintiff has stated a claim upon which relief may be granted against them, and SPL must remain in the suit as a necessary and indispensable party as long as those claims against the State Defendants are viable. Indeed, if the Plaintiff cannot voluntarily dismiss SPL from the suit because SPL is a necessary and indispensable party in this litigation along with the indispensable State Defendants, and claims made against the State Defendants must proceed, then SPL cannot move to dismiss the entire Amended Complaint as to it for the same reasons.

(*Id.* at 5 (emphasis in original).)

Plaintiff argues that, as a general rule, a Defendant lacks standing to move for dismissal of claims against another co-defendant.  (Doc. 72 at 6–8 (citations omitted).)  Thus, SPL lacked the capacity to seek dismissal of the claims against the State Defendant, who did not join in SPL's motion and did not seek dismissal but rather filed their own limited motion to dismiss.  Plaintiff again asserts:

> However, as discussed above, SPL's moving for such relief on its own creates an untenable procedural situation under the circumstances. Plaintiff posits that the Court cannot grant SPL's motion to dismiss the entire Amended Complaint when the Court has already found SPL to be an indispensable party defendant, and SPL's two indispensable party co-defendants (the State Defendants) not only have not moved for the same total dismissal relief sought by SPL, but acknowledge that under Louisiana law, the Plaintiff has stated claims upon which relief may be granted against them. (Docs. 66, 66-1). Indispensable party defendant SPL cannot be granted dismissal of the entire Amended Complaint as to it when the State Co-Defendants acknowledge that the very same claims made against them may proceed under Louisiana law. If SPL is truly indispensable, it must remain in the case.

(*Id.* at 7–8.)  Plaintiff maintains that SPL should be "estopped" from moving for total dismissal.

> In the alternative, Plaintiff argues that it has "overwhelmingly" stated a claim for relief.

(*Id.* at 9.)  Again, Plaintiff avers that it has standing to pursue the claims against the State Defendants, who do not challenge Plaintiff's claims.  Plaintiff states:

> Under the circumstances and because the Plaintiff's claims are viable against the State Defendants, and because SPL has been determined to be an indispensable party defendant by the Court, SPL has no choice but to remain in the suit to defend whatever interests it may have in the ITE Contracts to the extent it deems necessary. SPL cannot procedurally move to dismiss the entire Amended Complaint with prejudice as to it when it has been determined to be an indispensable party defendant by the Court and the same claims alleged against the State Defendants will proceed.

(*Id.* at 10.)  Plaintiff asks for leave to amend the operative complaint to cure any deficiencies.

(*Id.*)

Lastly, Plaintiff argues that the three issues raised by the State Defendants should be denied on the same grounds articulated above. Alternatively, the motion to dismiss on these issues should be denied on the same grounds identified in Plaintiff's opposition to the State Defendants' motion. (*Id.* at 10–11.)

### 3. SPL's Reply (Doc. 76)

SPL responds that Plaintiff's opposition "confirms that the First 'Amending' Class Action Complaint . . . does not plead the facts required to state a viable legal claim, and that Plaintiff cannot do so as a matter of law." (Doc. 76 at 1.) SPL continues: "Indeed, Plaintiff's Opposition nowhere confronts any of the numerous factual and legal deficiencies of the Complaint that are set forth in SPL's motion." (*Id.*) SPL asserts that what Plaintiff has done instead is, "for the second time in this lawsuit[,] . . . engage in a procedural shell game to avoid dismissal of its claim" on the grounds of "estoppel" from State Defendants' alleged admission. (*Id.*) SPL argues that the State Defendants made no such concession and, even if it had, "Plaintiff's estoppel argument is contrary to the established law of this Circuit, as well as basic logic and procedural fairness." (*Id.*)

After asserting that Plaintiff has waived any objection to SPL's motion through its silence, SPL reiterates that Plaintiff has failed to state a claim under any theory. SPL's facility satisfies the definition of "manufacturing establishment", and "Plaintiff's Opposition provides no response to these undisputed facts or the longstanding law of Louisiana." (*Id.* at 3.)

As to Plaintiff's "estoppel" argument, SPL argues that it is "based on an incorrect factual premise and a misapprehension of the law." (*Id.*) First, the State did not "acknowledge" that Plaintiff stated a claim; rather, the "State merely recognized 'that Louisiana law grants a citizen the right to seek judicial review of acts of public servants that are alleged to have been illegal or

unconstitutional , and to enjoin any unlawful action by those public servants.' " (*Id.* at 3–4 (quoting (Doc 72 at 2 (quoting Doc. 14-1 at 2), 4 (quoting Doc. 66-1 at 2)).) But SPL asserts: "The fact that a taxpayer could have standing to challenge an act does not mean that a plaintiff has pled sufficient facts of an illegal and unconstitutional act." (*Id.* at 4.) SPL notes that two of the cases on which Plaintiff relies actually find the complaint to be insufficient to state a claim. (*Id.* at 4 n. 2.) This standing argument does not mean that Plaintiff stated a claim. And finally, "Lest there be any doubt, the State has further clarified that it fully agrees with SPL's assertion that the Complaint does not state a cause of action and should be dismissed in its entirety." (*Id.* at 4 (quoting Doc. 73 at 1–2 & n. 2).)

Second, SPL contends that (a) it is hornbook law that any defendant can move to dismiss an insufficient complaint, and (b) " 'where a defending party establishes that plaintiff has no cause of action, this defense should inure to similarly situated defendants.' . . . 'The policy rationale for this rule is that it would be "incongruous" and "unfair" to allow some defendants to prevail, while not providing the same benefit to similarly situated defendants.' " (Doc. 76 at 4–5 (citations omitted).) As a result, SPL does have the right to dismiss the Amended Complaint in its entirety because of Plaintiff's failure to state a claim.

In closing, SPL urges that Plaintiff should be denied leave to amend. Plaintiff fails to provide any information on what facts he might assert to cure the deficiencies. (*Id.* at 6 (citing, *inter alia*, *Patrick v. Wal-Mart, Inc.*, 681 F.3d 614, 623 (5th Cir. 2012); *Waggoner v. Denbury Onshore, LLC*, 612 F. App'x 734, 740 (5th Cir. 2015)).) Further, according to SPL, leave to amend would be futile and cause undue delay and prejudice to SPL, "which has already constructed a multi-billion dollar LNG facility in reliance on its ITE Contract with the State."

(*Id.* at 6–7 (citing *Sinclair v. Petco Animal Supplies Stores, Inc.*, 581 F. App'x 369, 371 (5th Cir. 2014).) SPL asserts:

> Plaintiff has <u>never</u> disputed the deficiencies in the Complaint as set forth in SPL's Motion, and avoided responding to them altogether through procedural posturing. This matter has been pending more than a year and a half, and there is no reason to allow Plaintiff to continue to create needless uncertainty about SPL's investment in its liquefaction facility based solely on innuendo, not facts. Plaintiff has had every opportunity to plead a claim. It has not done so, and the Complaint should be dismissed without leave to amend.

(Doc. 76 at 7 (emphasis in original).)

### B. Analysis

#### 1. Plaintiff Has Failed to State Any Viable Claim

As a preliminary note, Plaintiff did not respond to the substance of any of SPL's arguments. "The Fifth Circuit makes it clear that when a party does not address an issue in his brief to the district court, that failure constitutes a waiver on appeal." *Magee v. Life Ins. Co. of N. Am.*, 261 F. Supp. 2d 738, 748 n. 10 (S.D. Tex. 2003) (citations omitted); *see also United States v. Reagan*, 596 F.3d 251, 254–55 (5th Cir. 2010) (defendant's failure to offer any "arguments or explanation . . . is a failure to brief and constitutes waiver"). "By analogy, failure to brief an argument in the district court waives that argument in that court." *Magee*, 262 F. Supp. 2d at 748 n. 10; *see also Kellam v. Servs.*, No. 12-352, 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013), *aff'd sub nom. Kellam v. Metrocare Servs.*, 560 F. App'x 360 (5th Cir. 2014) ("Generally, the failure to respond to arguments constitutes abandonment or waiver of the issue." (citations omitted)); *Mayo v. Halliburton Co.*, No. 10-1951, 2010 WL 4366908, at *5 (S.D. Tex. Oct. 26, 2010) (granting motion to dismiss breach of contract claim because plaintiff failed to respond to defendants' motion to dismiss on this issue and thus waived the argument). On this ground alone, the Court could dismiss Plaintiff's Amended Complaint.

Nevertheless, the Court finds that SPL has shown that Plaintiff has still failed to state a cognizable claim. As the Louisiana First Circuit explained in *Robinson v. Ieyoub*, 97-2204 (La. App. 1 Cir. 12/28/98), 727 So. 2d 579, 583, in interpreting La. Const. art. VII, § 21(F):

> In general, the constitution is subject to the same rules of interpretation as other laws and written instruments. When a constitutional provision is clear and unambiguous, and its application does not lead to absurd consequences, it must be applied as written without further interpretation in search of its intent. Every provision must be interpreted in light of the purpose of the provision and the interests it furthers and resolves. When a constitutional provision is identical or very similar to that of a former constitution, it is presumed that the same interpretation will be given to it as was attributed to the former provision. Because the question of how the constitution was understood by the people adopting it, not merely how it was viewed by the drafters, the debates of a convention, as a general rule, cannot be resorted to for the purpose of varying the otherwise clear and unambiguous meaning of a constitutional provision.

*Id.* (quoting *Succession of Lauga*, 624 So. 2d 1156, 1165 (La. 1993).

Again, La. Const. art. VII, § 21(F) provides in relevant part:

> The terms "manufacturing establishment" and "addition" as used herein mean a new plant or establishment or an addition or additions to any existing plant or establishment which engages in the business of working raw materials into wares suitable for use or which gives new shapes, qualities or combinations to matter which already has gone through some artificial process.

*Id.*

"The purpose of the Industrial Tax Exemption Program is to provide an incentive for businesses to locate and/or expand in Louisiana, thereby increasing employment opportunities and boosting state and local economies." *Robinson*, 727 So.2d at 583. The ad valorem tax exemption goes back to the Louisiana Constitution of 1921, and the "present definition of manufacturing establishment contained in the Louisiana Constitution of 1974 mirrors the language of the 1938 amendment to the 1921 Constitution." *Id.* The *Robinson* court explained:

> [T]he exact language used to define a manufacturing establishment in the constitution originates from the judicial definition of a manufacturer. This

definition can be traced to two cases. The first is *City of New Orleans v. LeBlanc*, 34 La. Ann. 596 (La. 1882), wherein the court defined a manufacturer using the exact language now found in our constitution, but also indicated that the end result of a manufacturer's work would yield a product to be placed in the stream of commerce. The court wrote that "manufacturers are the suppliers of the dealers, or consumers." *City of New Orleans v. LeBlanc*, 34 La. Ann. at 597–98. The court's initial definition of a manufacturer encompassed his role in commerce and trade, which necessitated the production of a good that the dealers and consumers would find useful, thereby creating a demand for that product.

In *City of New Orleans v. Ernst*, 35 La. Ann. 746 (La. 1883), the court also defined a manufacturer using the exact language as contained in the constitution. The court further indicated that a manufacturer is one who "prepares the original substance for use in different forms. He makes to sell, and stands between the original producer and the dealer, or first consumers, depending for his profit on the labor, which he bestows on the raw material." *City of New Orleans v. Ernst*, 35 La. Ann. at 747. Again, the court clearly contemplated that a manufacturer's product would have a use.

*Robinson*, 727 So. 2d at 583–84. In *Robinson*, the First Circuit found that a company running a hazardous waste incinerator facility was not entitled to tax exemption because what was actually sold was the "actual incineration service" and because the company "did not create a product from the incinerator ash that could be sold for use or sold as a component of another product which had a use." *Id.* at 584.[3]

---

[3] The *Robinson* court went on to conclude:

> When considering the goals sought to be accomplished by the ad valorem tax exemption, a manufacturer must be required to produce products suitable for use. Any other interpretation would frustrate the reason for the ad valorem tax exemption program. State and local economies are boosted when a manufacturer produces products which can be sold for use, thereby increasing revenue for the manufacturer, which translates into taxable profits, taxable income for employees, and sales taxes on the products manufactured. If a manufacturer only changes the shapes, qualities, or composition of something and the product is not suitable for use, this does not stimulate the economy in terms of providing other taxable sources. If the product is not suitable for use, the economy is not affected in a positive manner and alternative tax revenue opportunities do not exist. Therefore, we find the "suitable for use" requirement must apply whether a manufacturer is working raw materials into wares, or taking materials which have already gone through some artificial process and changing its shape, qualities, or composition.
>
> We find the trial court did not err when it found that Rollins did not meet the constitutional definition of a manufacturing establishment. The record reflects that the incinerator ash produced by Rollins is not the product of a process which contemplates its use after incineration, nor does Rollins take

Notwithstanding *Robinson*, SPL cites to a host of cases in which the tax exemption was allowed under the parameters set out in *LeBlanc* and *Ernst*. *See, e.g., State v. Transmission Mach. Co.*, 157 La. 827, 828, 103 So. 180 (1925) (finding that business engaged in "manufacturing" when its "business consist[ed] of casting wheels (pulleys) out of iron, trimming and finishing same by means of lathes, and drilling therein such holes as are needed for fitting them where they belong"); *State v. Am. Creosote Works*, 163 La. 547, 550, 112 So. 412, 413 (1927) (finding that company was engaged in a "manufacturing process" when "[r]ough timber and lumber [was] converted into telephone and telegraph poles, cross-arms for said poles," and many other named products "through the process of creosoting"). In *American Creosote Works*, the court collected a number of other cases reaching the same result:

> In State v. Amer. Biscuit, Mfg. Co., 47 La. Ann. 160, 16 So. 750, it was held that one who made crackers and Italian paste from flour was a manufacturer.
>
> In State v. Wilbert, 51 La. Ann. 1223, 26 So. 106, it was held that:
>
>> 'The proprietor of an establishment employed in the conversion of saw logs into lumber of different kinds and qualities in its rough state, is engaged in changing, by machinery, of raw materials into new and useful forms, and is therefore a manufacturer. * * *'
>
> The court has also held to be manufacturers and as such exempt from license taxes the following classes of business, viz.: A company engaged in the refining of sugar State v. American Sugar Refining Co., 108 La. 603, 32 So. 965); a company engaged in the business of casting iron wheels (State v. Transmission Machinery Co., 157 La. 827, 103 So. 180); and a company making only special brands of cakes

---

any steps to make the incinerator ash marketable, which could be considered as evidence the incinerator ash had some use. Although the incineration process does change the hazardous waste into incinerator ash, because the ash is not "suitable for use," Rollins cannot be considered a manufacturing establishment according to the constitution.

By granting a facility that did not qualify as a manufacturing establishment an industrial ad valorem tax exemption, the Board clearly exceeded it constitutional authority. The decision of the trial court is affirmed.

*Robinson*, 727 So.2d at 584.

entirely by machinery, except the icing and wrapping (State v. Young, 157 La. 845, 103 So. 186).

*Id.*, 163 La. 550–51, 112 So. at 413–14.

Also persuasive, SPL points to a Louisiana Attorney General opinion directly on point. Specifically, in La. Op. Atty. Gen. 1938–1940, p. 1180 (Dec. 16, 1938), the Attorney General was asked to evaluate whether a company was "eligible for tax exemption" under Article VII, Section 21(F)'s predecessor when the company's application covered "machinery for treating raw gas to remove undesirable elements which are present as it flows from the well." *Id.* The opinion concluded: "We are of the opinion . . . that the plants or establishments where the raw natural gas is treated to remove undesirable elements, such as salt, water and other impurities and to convert the gas into a usable fuel, are within the definition of the term 'manufacturing establishment' as found in . . . the Constitution." *Id.* at 1181–82. While this opinion is not binding, the Court finds it persuasive. *See Colvan Cattle Co., L.L.C. v. Lafourche Par. Gov't*, No. 08-907, 2009 WL 2914369, at *5 (E.D. La. Sept. 4, 2009) (stating that "Louisiana Attorney General opinions are merely advisory and not binding, though regarded by Louisiana courts as persuasive" and finding that, "[a]s there [was] no case on point regarding the scope of" a particular statute, "the opinion provide[d] further persuasive support in favor of Defendant's position[.]" (citation omitted)); *cf. Ellis v. State Nat. Bank of Ala.*, 434 F.2d 1182, 1190 (5th Cir. 1970) (finding that a particular opinion fell "short of a definitive statement of Alabama law," but stating, "It is well recognized that state attorney general opinions are advisory in nature. . . . Such opinions are often strongly persuasive.").

Looking at La. Const. art. VII, § 21(F) and this authority in conjunction with the documents submitted with SPL's motion,[4] the Court finds that SPL's facility constituted a "manufacturing establishment." Again, SPL's documents were submitted to LDED on behalf of SPL after LDED initially questioned SPL's status as a "manufacturing establishment." (Doc. 67-2 at 1.) One document stated that Cheniere Partners "initiated a project to include liquefaction services at the [SPL] receiving terminal in Cameron Parish" and that "[a]dding liquefaction capabilities would transform the [SPL] terminal into a bi-directional facility capable of liquefying and exporting natural gas in addition to importing and regasifying foreign-sourced LNG." (Doc. 67-2 at 4.) The second document described the facility's process as follows:

> Natural gas is first treated to remove contaminants including CO2, water and mercury before entering the liquefaction section of the plant. The treated gas is then chilled to approximately —260 degrees Fahrenheit in successively colder heat exchangers that use propane, ethylene and methane as refrigerants. Product leaving the methane exchangers is LNG ready for storage.

(Doc. 67-2 at 6.)

Thus, this description clearly satisfies the definition of "manufacturing establishment." SPL's process satisfies the plain language of the La. Const. art. VII, § 21(F), as SPL is "engage[d] in the business of working raw materials into wares suitable for use or which gives

---

[4] While the Court can ordinarily not consider "matters outside the pleadings" on a Rule 12(b)(6) motion without converting it to a motion for summary judgment, Fed. R. Civ. P. 12(d), the Fifth Circuit has approved district courts' consideration of documents attached to a motion to dismiss, when such documents are referred to in the plaintiff's complaint and are central to the plaintiff's claim. *See Werner v. Dept. of Homeland Sec.*, 441 Fed. App'x. 246, 248 (5th Cir. 2011); *Scanlan v. Texas A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

Here, SPL's documents satisfy this standard. Plaintiff alleges, on information and belief, that while SPL provided further information to LDED about its purported manufacturing process, "that provided information confirmed that SPL's process does not meet the qualification of manufacturing under the constitutional provision" because "SPL's process simply takes natural gas and freezes it until it turns into liquid form" and that the Application and this "additional information . . . comprises all of the descriptions and information SPL provided to LDED about its process." (Doc. 61 ¶¶ 13–14.) Critically, one of Plaintiff's grounds for invalidating the Contract was that ""the process described by SPL in its Application *and/or as described in additional information provided to LDED* does not meet the required definition of 'working raw materials . . .'" (Doc 61 ¶ 35 (emphasis added).) For these reasons, the Court finds that this document is referenced in and central to the Amended Complaint, so it can be considered in connection with the instant motion.

new shapes, qualities or combinations to matter which already has gone through some artificial process." *Id.*

Even if this language were ambiguous, SPL's facility constitutes a "manufacturing establishment" under the above authorities. As in *LeBlanc*, *Ernst*, and their progeny, SPL is creating a product capable of use for the stream of commerce and "stand[ing] between the original producer and the dealer, or first consumers." *Robinson*, 727 So.2d at 583–84 (citations omitted). And, like in the Attorney General Opinion, SPL is taking "the raw natural gas" and "treat[ing] [it] to remove undesirable elements, such as salt, water and other impurities . . . to convert the gas into a usable fuel." La. Op. Atty. Gen. 1938–1940 at p. 1181–82. As a result, even assuming the La. Const. art. VII, § 21(F) were ambiguous, SPL is, under the above authorities, a "manufacturing establishment." Plaintiff's claims thus fail as a matter of law.

In Plaintiff's proposed Sur-reply, Plaintiff focuses on the allegations of the Amended Complaint, which state that the information SPL provided in its application was inadequate. (Doc. 77-1 at 1–2.) Even if the Court were to consider this Sur-reply, and even acknowledging that SPL's documents conflict with Plaintiff's claims, these exhibits control over the allegations. *See Keane v. Fox Television Stations, Inc.*, 297 F. Supp. 2d 921, 925 (S.D. Tex. 2004), *aff'd*, 129 F. App'x 874 (5th Cir. 2005) ("courts 'are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint.' " (citing *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003); *Nishimatsu Const. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) (concluding that when plaintiff attaches documents to a complaint that contradict statements in the complaint itself, the more specific document controls))). For this additional reason, dismissal is warranted.

Further, even putting this aside and assuming that SPL's facility failed to meet the definition of a "manufacturing establishment", Plaintiff's claims must also be dismissed because Plaintiff has failed to demonstrate that the State Defendants abused their discretion in entering into the Contract. La. Const. art. VII, § 21(F) vests the State Defendants "with wide discretion in their efforts to attract industries to this state; their executing of a contract with any new industry that applied for the tax relief was not made mandatory." *See State ex rel. Kohler's Snowite Laundry & Cleaners v. State Bd. of Commerce & Indus.*, 205 La. 622, 626, 17 So.2d 899, 900 (1944). Agency action must stand unless there is an "arbitrary, unjust or capricious exercise of that discretion." *Id.*, 205 La. at 632, 17 So.2d at 902. "It may be that the board's discretion was exercised unwisely, and not to the best interests of the state, in some instances; but whether it was is not for us to decide. . . . We are to determine in this case whether there has been an arbitrary, discriminatory and capricious abuse of the board's discretion[.]" *Id.*, 205 La. at 639, 17 So.2d at 904; *see also Bunge N. Am., Inc. v. Bd. of Commerce & Indus. & Louisiana Dep't of Econ. Dev.*, 2007-1746 (La. App. 1 Cir. 5/2/08), 991 So.2d 511, 531 (affirming denial of tax assessor's motion for summary judgment and finding that he failed to demonstrate no genuine issue of material fact that the "Board and State acted arbitrarily and capriciously when it approved and entered into the contract that provided an exemption from *ad valorem* taxes" for addition to appellant's soybean facility); *cf. id.* at 520 (finding that plaintiff stated a claim that Board "clearly exceeded its constitutional authority" in granting an exemption which was allegedly not "a manufacturing establishment under the definition found in La. Const. art. VII, § 21(F)" (citing *Robinson*, 727 So.2d at 584)).

Here, the Court agrees with SPL that Plaintiff has failed to demonstrate arbitrary or capricious action by the State Defendants; to the contrary, the documents submitted by SPL

contradict Plaintiff's conclusory allegations and demonstrate a considered decision by the State Defendants. According to the Amended Complaint, the Board received an initial description of the manufacturing process from SPL, informed SPL that "after several discussions internally about the proposed project, . . . the consensus" was that SPL's description was not satisfactory, and asked SPL for "a better description." (Doc. 61 ¶¶ 8–12.) Plaintiff acknowledges that SPL "did provide further information to LDED about its purported manufacturing process" yet claims this still "did not meet the qualification of manufacturing under the constitutional provision." (Doc. 61 ¶ 13.) But, as shown above, the documents submitted by SPL provide a firm basis for the State Defendants' decision. Even if the Board's choice was wrong, it did not rise to the level of arbitrary and capricious conduct.

Lastly, as to the "addition" versus "new" manufacturing establishment claim, the Court also finds that this is a distinction without a difference. Again, Article VII, Section 21(F) provides in relevant part:

> (F) Notwithstanding any contrary provision of this Section, the State Board of Commerce and Industry or its successor, with the approval of the governor, may enter into contracts for the exemption from ad valorem taxes of *a new manufacturing establishment or an addition to an existing manufacturing establishment*, on such terms and conditions as the board, with the approval of the governor, deems in the best interest of the state.

La. Const. art. VII, § 21(F) (emphasis added). As SPL contends, the constitutional provision authorizes an exemption for new manufacturing establishment or additions, and there is nothing in this section that would invalidate an exemption if an application said it was one when it was in fact the other. Further, Plaintiff has failed to point to any regulation or statute that would nullify the Contract under this set of facts.

For all these reasons, the Court finds that Plaintiff has failed to state a claim upon which relief can be granted. As a result, SPL's motion should be granted.

## 2. Plaintiff's "Estoppel" Argument Is Without Merit

Without any opposition to the substance of SPL's arguments, Plaintiff makes the following circuitous argument: (1) because State Defendants allegedly admit that Plaintiff has stated a claim, (2) because SPL cannot seek dismissal of claims against State Defendants, and (3) because SPL is a necessary, indispensable party, SPL is "estopped" from seeking dismissal of the Amended Complaint.

The Court rejects Plaintiff's argument. The Court has reviewed the State Defendant's alleged admission, and the Court does not believe it can be reasonably construed as Plaintiff would like.[5] But, even putting this aside, State Defendants have since made absolutely clear that they do *not* admit that Plaintiff stated a claim and in fact seek dismissal of the Complaint on the same grounds as SPL:

> JMCB posits that the State Defendants "do not dispute and clearly recognize that the Plaintiff has stated a claim upon which relief may be granted against them." Doc. No. 69, at 2. This is incorrect. In its original memorandum, the State Defendants observed, as a general proposition, that Louisiana law recognizes a cause of action, enjoyed only by taxpayers, to enjoin unconstitutional actions by state agencies. Doc. No. 66-1, at 2. The State Defendants have never conceded that the particular allegations made in the First Amended Complaint are sufficient to state this cause of action. To the contrary, the State Defendants' agree with their codefendant's assertion that these allegations do not state a cause of action. . . .

> The State Defendants' co-defendant has filed a motion to dismiss which challenges the cause of action jointly asserted against all defendants. Although the State Defendants have not formally joined in this motion, should this Court grant the co-defendant's motion, it should dismiss the First Amended Complaint as to the State Defendants as well. *Sanders v. Prentice-Hall Corp. System, Inc.*, 969 F. Supp. 481, 483 n. 1 & 487 (W.D. Tenn. 1997) (noting that in appropriate cases "the dismissal of the Complaint operates to the benefit of the non-moving defendants as well as to Defendants."). If the Court grants Sabine Pass Liquefaction, LLC's motion, but the

---

[5] Plaintiff traces State Defendants' alleged admission to a lengthy quote from *Bunge* concerning a taxpayer's right to "seek judicial review," annul unconstitutional or illegal contracts, and "enjoin unlawful action by a public body." (Doc. 72-2 at 2–3 (quoting *Bunge*, 991 So.2d at 523).) It is telling that this quote comes from the *Bunge* court's discussion on whether plaintiff had a *right of action*, not whether plaintiff stated a viable claim. As SPL notes, the *Bunge* court ultimately dismissed on summary judgment the attack on the tax exemption. *Bunge*, 991 So.2d at 530–31.

> State Defendants remain parties to this suit, the State Defendants will file a Rule 12(c) motion asserting the (successful) grounds for dismissal raised in the co-defendant's motion. *Walker v. Cain*, 2012 WL 3028016, *1 n. 1 (M.D. La. June 4, 2012).

(Doc. 73 at 1–2 & n. 2) Given this clear and unambiguous rejection of the central premise of Plaintiff's argument, Plaintiff's entire opposition fails.

Even putting State Defendants' clear and unambiguous statement aside, the Court disagrees with Plaintiff's argument. The Court previously ruled that SPL was an indispensable party to this suit because it was a party to a contract which Plaintiff sought to invalidate. (Doc. 57 at 11–13.) The Court found that any judgment invalidating the Contract in SPL's absence would be extraordinarily prejudicial to it. Plaintiff now is essentially trying to circumvent the Court's ruling by preventing SPL from defending its own interest.

Further, while the Court does not doubt that, as a general rule, one party cannot seek dismissal of the claims against another party represented by different counsel (which seems fairly non-controversial and commonsensical), this appears to be a special situation where the claims against the State Defendants and SPL are essentially one and the same: the invalidity of the Contract. It makes little sense from a logical or equitable standpoint to hold that SPL is estopped from seeking dismissal of all claims that would nullify its own contract (and tax benefit). *See Lewis v. Lynn*, 236 F.3d 766, 768 (5th Cir. 2001) (per curiam) ("where 'a defending party establishes that plaintiff has no cause of action ... this defense generally inures also to the benefit of a defaulting defendant.' . . . The policy rationale for this rule is that it would be 'incongruous' and 'unfair' to allow some defendants to prevail, while not providing the same benefit to similarly situated defendants." (internal citations omitted)); *Foxx v. My Vintage Baby, Inc.*, 624 F. App'x 318, 319 (5th Cir. 2015) ("[b]ecause [one defendant] established that [plaintiff] failed to state a cause of action [under Rule 12(b)(6)], that defense inures to the benefit

of the corporate defendants where [plaintiff] offers only bare assertions to the contrary." (citing

*Lewis*, 236 F.3d at 768)).  For all these reasons, the Court rejects Plaintiff's procedural defense. [6]

### 3. Leave to Amend Will Be Granted

Lastly, Plaintiff seeks leave to amend his complaint.  "[A] court ordinarily should not

dismiss the complaint except after affording every opportunity to the plaintiff to state a claim

upon which relief might be granted." *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1955).  The Fifth

Circuit has further stated:

> In view of the consequences of dismissal on the complaint alone, and the pull to
> decide cases on the merits rather than on the sufficiency of pleadings, district courts
> often afford plaintiffs at least one opportunity to cure pleading deficiencies before
> dismissing a case, unless it is clear that the defects are incurable or the plaintiffs
> advise the court that they are unwilling or unable to amend in a manner that will
> avoid dismissal.

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

One leading treatise has further explained:

> As the numerous case[s] . . . make clear, dismissal under Rule 12(b)(6) generally is
> not immediately final or on the merits because the district court normally will give
> the plaintiff leave to file an amended complaint to see if the shortcomings of the

---

[6] Putting aside the above rule about dismissing claims against similarly situated defendants, the Court notes in closing that, under the appropriate circumstances, the Court can *sua sponte* dismiss Plaintiff's claims.  *See Shawnee Int'l, N.V. v. Hondo Drilling Co.*, 742 F.2d 234, 236 (5th Cir. 1984) ("we . . .  align ourselves with our colleagues in the other circuits who have held that a district court may dismiss a complaint on its own motion for failure to state a claim" (collecting cases)); *Sanders*, 969 F. Supp. at 483 n. 1 & 487 (dismissing claims against non-moving defendants *sua sponte* because such claims were "equally meritless" and "because it would be expedient and in the interest of judicial economy to do so").  "[T]he district court can only dismiss an action on its own motion " 'as long as the procedure employed is fair[,]' " which means, "in this context[,] . . . 'both notice of the court's intention and an opportunity to respond.' " *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1177 (5th Cir. 2006) (citations omitted)).
    These circumstances were met here.  When the Court ruled that SPL was a necessary and indispensable party, the Court effectively gave Plaintiff notice that it viewed Plaintiff's claims against the State Defendants as essentially the same as Plaintiff's claims against SPL.  (*See* Doc. 57 at 11 ("If SPL were excluded from this case, SPL would essentially be at risk of losing its rights under the contract without any ability to voice an objection."), 12 ("the heart of this dispute is whether SPL's contract with the State Defendants is invalid so as to subject SPL to about $1.4 billion in additional taxes it contracted out of.").)  Further, the Court gave Plaintiff an opportunity to oppose dismissal of the State Defendants by giving Plaintiff an opportunity to oppose dismissal of essentially the very same claim made against SPL.
    Nevertheless, as will be explained in the next section, the Court is granting Plaintiff leave to amend the complaint to cure its deficiencies.  Thus, to the extent Plaintiff was not given adequate notice or an opportunity to respond, the Court does so through this ruling.

original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading. Thus, the cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim. A district court's refusal to allow leave to amend is reviewed for abuse of discretion by the court of appeals. A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

5B Charles A. Wright, Arthur R. Miller, *et al.*, *Federal Practice and Procedure* § 1357 (3d ed. 2016).

Here, Plaintiff requested leave to amend in the event SPL's motion was granted. While Plaintiff previously amended its complaint, it did not do so in response to a ruling by this Court assessing the sufficiency of Plaintiff's claims. Thus, though SPL makes a compelling case for denying leave to amend, the Court will act in accordance with the "wise judicial practice" and general rule and grant Plaintiff's request.

## V.     Conclusion

Accordingly,

**IT IS ORDERED** that *Sabine Pass Liquefaction, LLC's Motion to Dismiss* (Doc. 67) is **GRANTED**, and Plaintiff's claims are **DISMISSED WITHOUT PREJUDICE.**

**IT IS FURTHER ORDERED** that Plaintiff shall have twenty-eight (28) days from the Court's ruling on the State Defendants' *Motion to Dismiss Certain Claims Pursuant to Federal Rule of Civil Procedure 12(b)(6)* (Doc. 66) in which to cure the above deficiencies.  If Plaintiff fails to do so, Plaintiff's claims will be dismissed with prejudice.

Signed in Baton Rouge, Louisiana, on <u>August 23, 2018</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**